IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Logan Houle, | Case No. 3:23-cv-00985 |
| Plaintiff, | Judge James G. Carr |
| v. | |
| Marion Police Dep't., *et al.*, | **ORDER** |
| Defendants. | |

This is case filed under § 1983 alleging excessive force. Logan Houle (Plaintiff) sued the City of Marion, its Police Department,[1] Lieutenant Rob Musser, and Officers Dana Jagger and Justin May (Defendants) claiming the Officers "repeatedly brutalized" him during his arrest. (Doc. 1).

Defendants filed a Motion for Summary Judgment. (Doc. 23). Plaintiff filed an Opposition. (Doc. 25). And Defendants filed a Reply. (Doc. 27). For the reasons that follow, I grant Defendants' Motion and dismiss the case.

## Background

Plaintiff was tried and convicted for crimes that occurred during the encounter giving rise to this case. The Third District Court of Appeals affirmed his conviction. So, I base the majority of the facts on the record of the state courts, the transcripts of which were filed with this Court. (Docs. 22-1, 22-2, and 26-1). This consists of the testimony of the involved Officers and a

---

[1] Defendants filed a Motion to Dismiss the Marion Police Department from the suit arguing it is not *sui juris* and lacks the legal capacity to be sued. (Doc. 10, PgID 69-70). Plaintiff, acknowledging this, responded that naming the Department as a party was inadvertent and was only intended to be named as a branch of the City. (Doc. 12, PgID 73). I therefore dismissed the Police Department. (11/23/2023 Order).

1

911 dispatcher and the Officers' body cam footage. And to the extent Plaintiff's affidavit asserts facts and not legal conclusions,[2] I rely on those assertions as well. (Doc. 25-1).

### Facts

On May 13, 2021, a male caller contacted the Marion, Ohio Sheriff's Department from Columbus at 7:38 p.m. on the business line. (Doc. 26-1, PgID 1451-52, 1459). 911 Dispatcher, Justin Smith, received the call. (*Id.*). The caller reported his former girlfriend and the mother of his child, Sierra Braden, was inside an apartment in Marion. She was texting him that a male was banging on the front door. She claimed he had a knife in his hand and was threatening to kill her. (*Id.* at 1367-69, 1395, 1452-53).

Dispatcher Smith started the call for service, and his partner dispatched Marion City Police to respond to a serious matter at 623-B Tyler Street. (*Id.* at 1452-53, Doc. 22-2, pgID 1005). A "tone was dropped," signaling a high priority dangerous situation and silencing all non-emergency radio traffic. (Doc. 26-1, PgID 1396, 1404, 1456, Doc. 22-1, PgID 943).

Four minutes later, Officer Dana Jagger, was the first to arrive at the apartment. (Doc. 26-1, PgID 1457). Things were quiet, and she observed nothing unusual. (Doc. 25-1, ¶ 7, Doc. 26-1, PgID 1361). She knocked on the door, and Plaintiff, clad in shorts and a t-shirt, opened it. (*Id.* at ¶7, *Id.* at 1415, Doc. 22-2, PgID 1043-44). Officer Jagger asked if his name was Tyler. (Doc. 26-1, PgID 1362-63, Doc. 22-2, PgID 1009). He replied no, his name was Logan. (Doc. 25-1, PgID 1303 ¶7.). Plaintiff assumed they were looking for someone else. (*Id.*).

---

[2] Plaintiff's Affidavit is replete with legal conclusions, inflammatory opinion, and information beyond the extent of an affidavit based on personal knowledge and attestation. To the end, I disregard portions of it. In addition, Plaintiff heavily relies on the proffered testimony of his expert witness, Ron Scheiderer. However, the trial court refused to consider atthe testimony, a decision the appellate court upheld. (Doc. 25-4, PgID 1334-35). Furthermore, Plaintiff submits no affidavit or deposition transcript in support of his Opposition. I, therefore, do not give this testimony any weight.

Officer Jagger, who had confused the street name for Plaintiff's name, testified Plaintiff was defensive and "standoffish." (Doc. 22-2, pgID 1011). She believed Plaintiff had taken narcotics, specifically because his pupils were pinpoint and fixed, and because of his paranoid behavior, movements, emotional reactions, and lack of cooperation. (*Id.* at 1012-13). She was immediately uneasy just by his size, he being 6'4" and she 5'1". (*Id.* at 1010).

Officer Jagger asked Plaintiff to step out of the apartment, and he questioned why. (*Id.* at 1040). She informed him about the emergency call and told him she needed to pat him down for weapons. (*Id.* at 1044). Plaintiff acknowledges he was in the apartment, but states he was in the bedroom with his girlfriend, Kadijah Sanders. (Doc. 25-1, PgID 1303 ¶6). Plaintiff seemed agitated, calling the females "bitches," and accusing them of lying. (Doc. 22-2, PgID 1045).

Officer Jagger attempted to pull Plaintiff outside of the apartment by grabbing his shirt. (*Id.* at 1042, Doc. 26-1, PgID 1362-63, Doc. 25-1, PgID 1303 ¶ 7-8). She was concerned he would go back in for the knife. (Doc. 22-2, PgID 1101). Plaintiff resisted and turned to walk back into the apartment. (*Id.* at 1042).

Plaintiff ultimately complied, and Officer Jagger performed a pat down search. (Doc. 25-1, ¶10). She found no weapons. (*Id.*, Doc. 26-1, PgID 1374, 1400). Around this time, Co-Defendants, Lt. Rob Musser and Officer Justin May arrived on the scene.

Officer May was on patrol when he received the dispatcher's call. (Doc. 22-1, PgID 909, Doc. 26-1, PgID 1518). He responded, engaging his lights and sirens. (*Id.* at 909, *Id.* at 1465). Lt. Musser arrived around the same time as Officer May. (*Id.* at 1404, Doc. 22-2, PgID 1080).

Officers Jagger and May, undisputedly without a warrant, proceeded to search the apartment. (Doc. 26-1, PgID 1365-66, Doc. 22-1, PgID 926, Doc. 25-1 ¶7-8). Their purpose for entry was to ensure no one was hurt and no other persons were hiding. (Doc. 26-1, PgID 1487, Doc. 22-1, PgID 913-14). They found a kitchen knife on the counter, but nothing seemed out of

3

place. (Doc. 26-1, PgID 1367). After they cleared the apartment, they began questioning the females about the dispatch call. (*Id.*). Finding no emergency, Officer May cleared the emergency radio tone, allowing all radio traffic to flow. (*Id.* at 1482, Doc. 22-1, PgID 943-44).

At the time of the search, Lt. Musser stood outside speaking with Plaintiff. (Doc. 22-2, PgID 1082). Plaintiff attempted to shake his hand, but Lt. Musser informed him due to Covid restrictions, he could not do so. (Doc. 26-1 at 1416). Lt. Musser inquired whether Plaintiff had permission to be at the residence. (*Id.* at 1420-21). Plaintiff replied he did and had messages on his phone to prove it, but stated he would not show them to him. (*Id.* at 1416, 1420-21). He told Lt. Musser one of the females was his girlfriend, calling her "crazy." (*Id.* at 1416-17, 1422).

Lt. Musser described Plaintiff as "anxious." (Doc. 26-1, PgID 1409, 1422, Doc. 22-2, PgID 1084). He was evasive with his answers and pacing. (*Id.*). Plaintiff walked up into Lt. Musser's space. (*Id.* at 1422). He began asking about his phone. (*Id.* at 1485). But before Lt. Musser could respond, Plaintiff attempted to enter the apartment to retrieve it. (*Id.* at 1417, 1485). Lt. Musser told him not to go in. (Doc. 22-2, PgID 1083-84). Nonetheless, Plaintiff attempted to slide around Officer May, who was standing in the doorway, to go back into the apartment. (Doc. 22-1, PgID 931, Doc. 26-1, PgID 1485).

Officer May put out his hand to stop Plaintiff, causing him to back up. (Doc. 221, PgID 931-32). As Plaintiff describes it, Officer May pushed him. (Doc. 25-1, ¶14). As Defendants describe it, Officer May held up a hand and blocked Plaintiff's path. (Doc. 26-1, PgID 1417, 1486). Regardless it was an act of keeping Plaintiff from entering the apartment due to the serious nature the caller's report. (*Id.* at 1420).

Plaintiff extended his hand to Officer May. (Doc. 22-1, PgID 945). Officer May did not know who Plaintiff was at the time, did not want Plaintiff in his space and did not want him

entering the apartment. (*Id.* at 945-46). So, Officer May moved Plaintiff's arm away in an attempt to guide him to where the females were standing. (*Id.*).

At this point, primarily due to Plaintiff's erratic behavior, which was putting the officers on edge, Lt. Musser decided to place Plaintiff in handcuffs. (*Id.*, Doc. 22-1, PgID 933, 1017). He felt this was necessary to complete their assessment of the scene and the investigation. (*Id.*).

Lt. Musser, however, had no opportunity to inform Plaintiff he was going to detain him. (Doc. 26-1, PgID 1423). Lt. Musser had just taken handcuffs off of his duty belt as and was approaching when Plaintiff pushed Lt. Musser and attempted to flee, a fact Plaintiff does not dispute. (Doc. 25-1, pgID 1305, Doc. 26-1, PgID 1409, 1468, 1487-90, Doc. 22-1, PgID 937, Doc. 22-2, PgID 1085). Defendants all state it was at this point, the detention turned into an arrest. (Doc. 26-1, PgID 1423, Doc. 22-2, PgID 1031-32, 1072, 1131-32).

Lt. Musser attempted to grab Plaintiff by his shirt. (Doc. 22-2, PgID 1086, 1113). But it was Officer May who successfully stopped Plaintiff. (Doc. 26-1, PgID 1469, 1491, Doc. 22-1, PgID 947-48, Doc. 22-2, PgID 1113-14). Plaintiff got about five to seven steps away, and Officer May threw him down. (*Id.*). In the process, all he could grab was Plaintiff's head and neck to keep control of him. (*Id.*).

Plaintiff continued to struggle, so Lt. Musser drew out his taser. (Doc. 22-2, PgID 1086). Officer May yelled, "give us your hands!" (Doc. 26-1, PgID1491). Plaintiff did not comply, continuing to actively resist, thrashing around and throwing his arms about . (*Id.* at 1470). Plaintiff, stating he "felt like running," was attempting to stand up, so Officer May, using his body weight, tried to "flatten him out on the ground." (*Id.* at 1470-71).

Lt. Musser was able to cuff Plaintiff's left hand, but he had another outburst. (Doc. 26-1, PgID 1382, Doc. 22-2, PgID1087). Officer May attempted to hold Plaintiff's upper body, while

5

Officer Jagger held his legs. (Doc. 26-1, PgID 1356, 1378, 1426, 1497-98, Doc. 22-1, PgID 969). Officer Jagger yelled for Plaintiff to "stop" [struggling]. (Doc. 22-2, PgID 1015).

At this time, Officer May was behind Plaintiff who was on the ground, and Lt. Musser was behind Officer May looking for an opportunity to fully cuff Plaintiff. (*Id.* at 1427). Lt. Musser saw Plaintiff put his hand on the grip of Officer May's holster and attempt to pull the gun. (Doc. 26-1, PgID 1411, Doc. 22-1, PgID 916, Doc. 22-2, PgID 1088).

Lt. Musser shouted, "gun, he tried to grab the gun" to warn the other officers. (*Id.* at 1411, 1472, Doc. 22-2, PgID 1057, 1088). Officer Jagger heard the alert and then saw Plaintiff's hand on the grip (the handle). (Doc. 22-2, PgID 1074). Officer May felt a hand on his loaded firearm, so he moved his hand to his holster. (*Id.* at 1472, Doc. 22-1, PgID 916-22).

Lt. Musser gave his taser to Officer Jagger. (Doc. 22-2, pgID 1016, 1058). She attempted to tase Plaintiff's hand, but at the same time Lt. Musser was trying to grab Plaintiff's hand, so she tased Lt. Musser's instead. (*Id.* at 1018, 1074, 1122; Doc. 26-1, PgID 1411, 1445).

Officer May reacted too. He was able to "swat" Plaintiff's hand away from his holster. (*Id.* at 1445, 1472-73, Doc. 22-1, PgID 920). But then Lt. Musser yelled" he's trying to grab the taser, get it out of there!" (Doc. 22-1, PgID 962, 975, Doc. 22-2, PgID 1058, 1089). So, Lt. Musser gave the instruction to "mace again." (*Id.* at 962, *Id.* at 1124). He also dispatched for back up. (Doc. 22-2, PgID 1090).

As this was occurring, Officer May had his arm around Plaintiff's neck. (Doc. 26-1, PgID 1425, 1470-73, Doc. 22-1, PgID 920, 969-70). The situation was escalated and dangerous, and when in a fight, an officer grabs hold of what they can until they can reposition. (Doc. 26-1, PgID 1425-26). And in this case, Plaintiff was attempting to take an officer's gun, and as Lt. Musser testified, that escalates the situation "one hundred percent." (*Id.* at 1442).

6

Officer May testified he did not apply pressure on Plaintiff's neck until he reached for Officer May's firearm. (*Id.* at 1474, 1494, 1496). At that point Officer May determined this was "a deadly force situation" because if Plaintiff had been successful in pulling out the weapon, someone would risk serious harm or death. (Doc. 26-1, PgID 920). Lt. Musser concurred it was a deadly force matter. (Doc. 22-2, PgID 1089).

So then Officer May applied pressure to Plaintiff's neck, putting him in chokehold.³ (Doc. 22-2, PgID 1089, Doc. 26-1, PgID 1474, 1500-01, 1504, Doc. 22-1, PgID 234). Because Plaintiff was still resisting, Officer May also gave the directive to "drive-stun" Plaintiff, which is the act of using a taser without the cartridge. (Doc. 26-1, PgID 1505-06).

Plaintiff continued to struggle, so much so, the Defendants had to tase Plaintiff at least five times and use mace several times. (Doc. 26-1, PgID 1356-57, Doc. 22-1, PgID 949-50). After Plaintiff was maced, he complained he could not breathe. (Doc. 26-1, pgID 1388-89). So, Lt. Musser ordered his Officers to keep Plaintiff on his side to assist his breathing. (*Id.* at 1437).

Ultimately, Defendants were able to cuff Plaintiff. (*Id.* at 1358-59, Doc. 22-1, PgID 921, Doc. 22-2, pgID 1091-92). When Lt. Musser yelled "cuff," Officer May nearly immediately released his hold of Plaintiff. (*Id.* at 1442-43, 1474-75, *Id.* at 922, *Id.* at 1092). Even then, as they got Plaintiff to his feet, he was still trying to resist. (*Id.* at 1475, 1506-08, *Id.* at 922-23). So Officer May gave a verbal command and put him back on the ground, (*Id.*).

Plaintiff landed face down, and Officer May landed on his left hip to the right of Plaintiff. (Doc. 22-1, PgID 915). At this point, Officer May had one knee against Plaintiff's back and one on his left hip. (*Id.* at 964, Doc. 26-1, PgID 1511). He instructed the two females to go back inside the house because they were too close to the dangerous situation. (*Id.*). He pulled his taser

---

³ Chokeholds are only permissible under Department policy when in a deadly force situation. (Doc. 22-2, PgID 1055, 1118, Doc. 26-1, PgID 1502-03). They are no longer taught at the Marion Police Department. (*Id.* at 117-18).

7

and placed it in the middle of Plaintiff's back to try and get Plaintiff to calm down and to deter further such conduct. (Doc. 26-1, PgID 1512-14, Doc. 22-1, PgID 923).[4]

Plaintiff calmed down, so Officer May put away the taser and rolled Plaintiff to his side to breathe because they were concerned for Plaintiff's well-being and safety. (Doc. 22-1, PgID 923, 965, Doc. 22-2, PgID 1093). Defendants then attended to Plaintiff by pouring water in his maced eyes and calling for a squad. (Doc. 22-1, PgID 924, Doc. 26-1, PgID 1360, 1412-13, 1439, 1476. 1516-17, Doc. 22-2, PgID 1019-21). Lt. Musser, who was also maced in the process, flushed out his own eyes after attending to Plaintiff's first. (Doc. 22-2, PgID 1092-95).

Lt. Musser gave the order to "get BJ down here." (Doc. 22-2, PgID 1061-62). BJ Gruber was the Major over Operations. (*Id.*). Lt. Musser called for the Major because he, as the commanding officer, was "out of commission" due to his personal involvement. So he needed a higher ranking officer to investigate the use of force. (*Id.* at 1062, Doc. 22-1, PgID 924).

An ambulance transported Plaintiff to Marion General Hospital and ultimately to Grant Medical Center in Columbus for treatment of his injuries. Plaintiff was charged with aggravated robbery and obstruction for his conduct. After a trial, the jury convicted him on both counts. (Doc. 25-3, Doc. 25-4). The state court judge sentenced Plaintiff to 9 to 13.5 years on the robbery conviction and one year on the obstruction charge. (Doc. 25-4, PgID 1321).

Plaintiff appealed. (Doc. 25-1, PgID 1307). The Third District Court of Appeals upheld the conviction. (Doc. 25-4). *State v. Houle*, 2023-Ohio-4609, 2023 WL8716468 (Ohio App. Ct. 2023). The court found Plaintiff was not wrongfully arrested and that he had "repeatedly failed to comply with the officers' instructions to stop resisting." (Doc. 25-4, PgID 1326).

**Discussion**

---

[4] Tasing for this purpose is permitted by Department policy. (*Id.* at 1514).

I.  **Summary Judgment Standard**

Summary judgment should be granted if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment is granted "against a party who fails to make a showing sufficient to establish an essential element…on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In reviewing the documents before me, I draw all reasonable inferences in a light most favorable to Plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254 (1986). In doing so, I nevertheless find Defendants are entitled to summary judgment as outlined below.

II.  **42 U.S.C. § 1983**

   a.  **Excessive Force – Fourth and Fourteenth Amendments**

Section 1983 itself creates no substantive rights. It provides a remedy for violations of federal rights established elsewhere. *City of Oklahoma City v. Tuttle,* 471 U.S. 808 (1985). *West v. Atkins,* 487 U.S. 42, 48 (1988). To succeed in a § 1983 case against a police officer, a plaintiff must establish that the officer deprived a person of their Fourth or Fourteenth Amendment rights against unreasonable searches and seizures while acting under the color of law. *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001).

Generally speaking a search and seizure is "unreasonable" and therefore unconstitutional where an arresting officer "did not have probable cause to believe the suspect posted a threat of serious harm to the officer or others." *Yatkso v. Graziolli,* 458 F. Supp.3d 702 (N.D. Ohio 2020) (Polster J.), *Floyd v. City of Detroit,* 518 F.3d 398 (6th Cir. 2008).

This is an objective test, to be judged from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). Relevant factors in determining the reasonableness of an officer's use of

9

force are: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the police officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Floyd*, 518 F.3d at 407.

Plaintiff argues that the state courts did not address the constitutional issues he raises in this suit. Though true, the factual and legal conclusions of those courts dictate the outcome here. In his criminal case, Plaintiff argued his detainment was "illegal," his arrest "unreasonable and illegal," and both were "excessive." (Doc.  Doc. 25-4, PgID 1321-22). The state courts rejected his arguments, as do I.

With respect to the Officers' initial detention, Lt. Musser determined handcuffs were necessary to restrain Plaintiff for an investigation. Defendants did not need probable cause as reasonable suspicion is all that is required. *State v. Hairston,* 156 Ohio St.3d 363 (2019). The state courts found Defendants had the right to justify the detention, and it was therefore reliable under principles enumerated in *Alabama v. White,* 496 U.S. 325 (1990). (Doc. 25-4, PgID 1327-29). Furthermore, Plaintiff's "erratic activity" justified Defendants taking "steps as reasonably necessary to protect [their] personal safety." (*Id.* at 1329).

And just as the state courts found the detention was lawful, so too was the arrest. The courts found Plaintiff's actions of fleeing, repeatedly resisting, and attempting to remove Officer May's gun from its holster warranted his arrest and the force required to do so. (*Id.* at 1335).

Tantamount to the issues before this Court, Plaintiff argued the trial court abused its discretion by refusing to allow a jury instruction on "excessive force." The appellate court denied this assignment of error, finding the three Officers combined had trouble subduing Plaintiff, and Officer May only applied "deadly force" once Plaintiff attempted to take his gun. (*Id.* at 1332). And this, held the court, was justifiable.

As the Marion County Court of Appeals noted, the trial court's conclusions of facts are accepted when supported by "competent, credible evidence." (Doc. 25-4, PgID 1322) (citing *State v. Burnside*, 100 Ohio St.3d 152 (2023). While legal conclusions are examined *de novo,* I credit the sworn testimony under oath as competent and credible. *See Id.* (citing *State v. Fanning*, 1 Ohio St.3d 19 (1982), *State v. McNamara*, 124 Ohio App.3d 706 (Ohio App. Ct. 1997)).

I acknowledge that collateral estoppel does not apply to bar the instant lawsuit because the state courts touched upon, but did not entirely analyze and rule on the constitutionality of Defendants' actions. *See e.g., Rice v. Barnes*, 966 F. Supp. 877 (W.D. Mo. 1997). But even under an independent § 1983 analysis, I cannot overlook what those courts already factually concluded.

I find Defendants did not violate Plaintiff's constitutional rights. First, the Fourth Amendment limits officers from using anything but the degree of force necessary to effectuate an arrest. *Graham v. Connor*, 490 U.S. 386, 394 (1989), *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997). In evaluating the degree of force, I do so from the perspective of a reasonable officer at the scene. *Graham* at 396-97.

Officers are often forced to make split-second decisions. Their safety is ever increasingly in danger.[5] Therefore the question is, under a "totality of the circumstances," was the seizure justified? *Stanfield v. City of Lima*, 727 F. App'x 841, 845 (6th Cir. 2018). And in considering the various factors, I find it was.

In first considering the severity of the crime(s) committed, Defendants were responding to an emergency dispatch from the Marion County Sheriff that a male with a knife was threatening a female, who was inside an apartment. On arriving, each Officer concluded that

---

[5] I take judicial notice that the number of officers killed in the line of duty is increasing – specifically a 25% increase from 2023 to 2024. https://nleomf.org/2024-law-enforcement-fatalities-report-reveals-law-enforcement-deaths-increased/. The leading circumstances surrounding those deaths was not premeditated attack. The majority of officer deaths occurred during investigative-enforcement, a 77.8% increase. https://le.fbi.gov/cjis-division/cjis-link/statistics-on-law-enforcement.

11

Plaintiff appeared to be under the influence of drugs; his behavior was erratic; he was defensive and paranoid; and he was not cooperating.

Second, there was an immediate threat of safety to the Officers or possibly others. The minute Plaintiff attempted to flee, the danger escalated. The Defendants had not even had time to fully assess the scene, interview the witnesses, or confirm there was no present danger to persons or property. And once restrained, when Plaintiff grabbed Officer May's gun, he created "a deadly force situation that easily could have resulted in serious physical harm or death.

Third, Plaintiff's continued resistance not just warranted - it dictated - the amount of force the Officers had to - and did - use. It ultimately took all three Officers to detain Plaintiff. (Doc 25-4, PgID 1326). After about a minute, Lt. Musser was able to place one handcuff on Plaintiff. (Doc. 26-1, PgID 1410). They could not get a cuff on the other wrist because Plaintiff was "fighting, pulling his arms back…trying to work his way back up to his feet…." (*Id.*).

Defendant Jagger used a taser on Plaintiff at least five times. Yet, with abnormal strength and stamina, Plaintiff continued to fight through it, grab the taser, and push it away. (Doc. 22-2, PgID 1017). To her, this was further indication Plaintiff was on a stimulant, which created a very dangerous situation. (*Id.*).

Plaintiff struggled so much that he knocked Officer Jagger's camera off of her. (*Id.* at 1016). He kicked her so hard, "he put [her] head into a parked car" in the nearby lot. (*Id.* at 1023-25). By the time Defendants fully restrained Plaintiff, they were about five feet from the original point of struggle, and part of Officer Jagger's body was under a car. (*Id.* at 1025-26, 1220).

Defendants also were injured in the struggle with Plaintiff. Officer Jagger had a black eye and suffered bruises and cuts on her elbow. (*Id.* at 1023-24). Lt. Musser had been maced, and he had injuries to his left forearm. (Doc. 22-2, PgID 1092-1097). Therefore, it was reasonable for the Officers to detain him and to do so forcibly.

Plaintiff's analysis of the matter is somewhat misplaced. He focuses on the extent of Defendants' investigation, Officer Jagger's asking a wrong name, and the fact the Officers found no weapons. In doing so, he argues if the Defendants "properly responded to the call, rather than immediately seeking to detain Plaintiff, none of this would have happened.

Whether it was reasonable for the police to create the circumstances that ultimately occurred is irrelevant in an excessive force case. *Yatkso v. Graziolli, supra,* at 715 (citing *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)). The critical analysis is what occurred once the Officers attempted to investigate.

Plaintiff seeks to justify, rather than acknowledge, his own actions, which were the causal link to his injuries. Had he simply complied with the Officers' requests and not attempted to flee, the arrest may never have materialized. And once detained and then arrested, had he not continued to fight, kick, attempt to grab weapons, and injure the Officers, they would not have had to use tasers, mace, and ultimately potential deadly force to subdue him.

A jury convicted Plaintiff of Aggravated Robbery and Obstructing Official Business for his conduct on May 13, 2021. (Doc. 25-3). The trial court sentenced Plaintiff to a lengthy sentence due to his serious crimes. As the courts noted, Plaintiff himself "created the danger." This all solidifies my conclusion to reject his excessive force claims. Were this case to proceed further, a jury, in light of the foregoing, could not find for the Plaintiff. Therefore, I find as a matter of law, Defendants did not violate Plaintiff's Fourth and Fourteenth Amendment rights.

b. **Eighth Amendment**

Nor do I find that Plaintiff can establish a claim for cruel and unusual punishment under the Eighth Amendment. He was not convicted and sentenced of any crime until February 2023, nearly two years after the arrest. And courts have clearly held the Eighth Amendment does not protect pretrial detainees or apply to search and seizures. *Kingsley v. Hendrickson*, 576 U.S. 389

(2015), *Ingraham v. Wright*, 430 U.S. 651 (1977). Regardless, the force the Officers, collectively and individually, used to restrain Plaintiff was not cruel or unusual. It was warranted.

### III. 42 U.S.C. § 1983 – City Liability under *Monell*

The Supreme Court eliminated *respondeat superior* liability in § 1983 cases except when the plaintiff can point to a governmental custom or policy that inflicted the injury. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). In order to maintain a case against Marion, Plaintiff must prove: (1) violation of a constitutional right; (2) caused by a policy or custom. *Smith v. Chambers-Smith,* No. 1:24-CV-505, 2024 WL 5075378, *12 (N. D. Ohio Dec. 11, 2024) (Fleming, J.). (citing *Monell*, 436 U.S. at 691). Plaintiff must "identify the policy, connect the policy to the entity itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir.1993).

In this case, because I find the Officers' conduct did not violate Plaintiff's constitutional rights, the City's liability becomes a moot point. As outlined above, Plaintiff has failed to demonstrate violation of his Fourth or Eighth Amendment rights. Assuming he could, he still has not demonstrated the City of Marion (1) maintained an illegal policy; (2) ratified illegal actions of its officers; (3) inadequately trained or negligently supervised them; or (4) tolerated or acquiesced in federal civil rights violations. *See Burgess v. Fischer,* 735 F.3d 462 (6th Cir. 2013)**.**

### IV. Qualified Immunity, Immunity under O.R.C. Chapter 2744, & State Law Claims

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

First, viewing facts in a light most favorable to him, has the plaintiff shown a constitutional violation occurred? Second, was the right clearly established at the time of the violation? *Phillips, supra* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). This determination is made case-by-case. *Butz v. Economou*, 438 U.S. 478 (1977).

Plaintiff bears the burden of defeating an immunity defense. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999); *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). Although it is undisputed Defendants used force to restrain Plaintiff, so much so, he required hospitalization, the issue is whether the force they used violated Plaintiff's rights. For the reasons outlined above, I find no constitutional violations. See *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Therefore, the analysis ends there.

Moreover, Defendants argue that Plaintiff's state law claims are barred by immunity bestowed to political subdivisions by the Ohio General Assembly under Ohio Rev. Code § 2744. This statute affords immunity in civil actions to municipalities and their employees involved in governmental functions. Immunity is removed only when the employee's actions were (a)"manifestly outside the scope of the employee's employment or official responsibilities;" (b) "committed with malicious purpose, in bad faith, or in a wanton or reckless manner;" or (c) liability is expressly imposed by state statute. O.R.C. § 2744.03.

Construing the facts most favorably for Plaintiff, I do not find the Defendants acted maliciously, recklessly or wantonly for the reasons outlined above. Plaintiff's attempt to flee upon seeing Lt. Musser's handcuffs and Defendants' inability to subdue him, despite multiple attempts, rendered their restraints reasonable, particularly given the fact they too sustained injuries from Plaintiff's resistance. They acted well within the scope of their responsibilities first to detain, then to subdue, then to arrest Plaintiff.

Further, both during and after the chaos, Defendants rendered aid to Plaintiff. They turned him to his side so he could breathe. They cleaned his maced eyes with water before their own. They called for emergency medical transport. Lt. Musser called his Major to assess the scene since he was out of commission.

I find Defendants' conduct to be far from reckless and clearly not wanton. Therefore, Plaintiff's remaining claims against the Defendants fail.

## Conclusion

For the foregoing reasons, I find the Officer Defendants did not violate Plaintiff's constitutional rights. Furthermore, there are no facts in the record to support agency liability against the City of Marion, or facts that warrant piercing Defendants' immunity from suit. Therefore, weighing the facts in a light most favorable to Plaintiff, Defendants are entitled to judgment as a matter of law.

It is, accordingly, hereby ORDERED THAT:

1. Defendants' Motion for Summary Judgment (Doc. 23) be, and the same hereby is, **granted**; and

2. Plaintiff's Complaint (Doc. 1) be, and the same hereby is, **dismissed**;

So ordered.

Date: June 30, 2025

/s/ James G. Carr
Senior U.S. District Judge